# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | | |
| A business located at 1748 W. 92nd Ave., Federal Heights, Colorado 80260; including all computers, phones, closed and locked containers therein that have been associated with their alleged drug trafficking and money laundering activities, <br><br> more fully described in Attachment A, attached hereto. | ) ) ) ) ) ) ) ) ) ) ) | Case No. 20-sw-00185-MEH |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the __State and__ District of __Colorado__ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;

- ☒ contraband, fruits of crime, or other items illegally possessed;

- ☒ property designed for use, intended for use, or used in committing a crime;

- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. §§ 841(a)(1) and 846, and the application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*s/Marc A. Soto*
*Applicant's signature*

_____
Marc A. Soto, Special Agent, HSI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __02/11/2020__

_____
*Judge's signature*

City and state: __Denver, CO__

Michael Hegarty
United States Magistrate Judge
*Printed name and title*

**<u>ATTACHMENT A</u>**

**<u>Description of Location to be Searched</u>**

**LOCATION #3 -** The SUBJECT BUSINESS is located at 1748 W. 92nd Ave., Federal Heights, Colorado 80260.   The SUBJECT BUSINESS is more particularly identified as a business in a strip mall.   The SUBJECT BUSINESS is constructed of red bricks.   The roof is flat. The front door faces north and above the door are the numbers 1748 in black, which is the physical location of the numbers of the SUBJECT BUSINESS.   The sign with the name "Envios La Paz" can be seen over the front door to the SUBJECT BUSINESS.   The location consists of the SUBJECT BUSINESS thereon. (see attached photos attached for further reference.)   The SUBJECT BUSINESS includes all computers, phones, closed and locked containers therein that have been associated with their alleged drug trafficking and money laundering activities, as further described in Attachment B and incorporated herein by reference.





**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items, located within the SUBJECT BUSINESS, as described in Attachment A, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 21, United States Code, Sections 841 & 846 (distribution of controlled substances and conspiracy to distribute controlled substances) and Title 18, United States Code, Section 1956 (money laundering) (the "Subject Offenses") between June 1, 2018, and the present:

1. Controlled substances or derivatives of those controlled substances;

2. Implements and materials used in connection with the manufacture, production, storage, or dispensing of drugs such as postage, packaging material, weight scales, plastic bags, plastic containers, cardboard boxes, mailing envelopes, packaging tapes, labels, label machines, vacuum sealers and cellophane;

3. Books, records, receipts, notes, ledgers, correspondence, and other information relating to the transportation, ordering, purchase, and distribution of controlled substances or proceeds of controlled substances, including customer lists, dealer lists, and contact information for any of these customers and dealers.

4. Articles of personal property tending to establish the identity of the persons in control of the SUBJECT BUSINESS and contraband-related paraphernalia located in the SUBJECT BUSINESS, such as rent receipts, mail envelopes, photographs, and keys;

5. Information, notes, software, documents, records, or correspondence evidencing violations of the Subject Offenses;

6. Information, records, documents, invoices, and materials that concern any accounts with an Internet Service Provider, email or social media accounts, or other remote computing storage;

7. Information, documents, records, photos, videos, or correspondence that aid in the identification of persons involved in violations of the Subject Offenses;

8. United States or other currency, financial instruments, jewelry, precious metals, and any containers or secret compartments capable of holding the same, that constitute evidence or proceeds of violations of the Subject Offenses;

9. Documents, records, or information relating to the transfer, purchase, sale or disposition of virtual currency or cryptocurrency.

10. Records and documents pertaining to banking, real estate, or other financial transactions, including the sale of goods, that constitute evidence of or proceeds of the Subject Offenses or the concealment or expenditure of proceeds of the Subject Offenses;

11. Indicia of occupancy, residency, rental and/or ownership of the SUBJECT BUSINESS, including, utility and telephone bills, canceled envelopes, rental purchase or lease agreements, and keys;

12. Indicia of ownership or control over any vehicles located at the place to be searched, including, but not limited to, titles, registrations, gas receipts, repair bills, and keys belonging to that vehicle;

13. Copies of income tax returns and related correspondence concerning CORTES-DURAN and Bryan Rodriguez who is the son of CORTES-DURAN and the registered agent for SUBJECT BUSINESS, and any other entities under the control of these individuals;

14. Travel records, including passports, visas, airline tickets, boarding passes and airline ticket receipts relating to the Subject Offenses;

15. Items used for identification, including identification cards under fictitious names, monikers, and any other type of identifying documents, whether legitimate or fictitious;

16. Records and keys related to self-storage units, post office boxes, commercial mail receiving agency private mail boxes, and safe deposit boxes;

17. Firearms and ammunition;

18. Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

    a. Routers, modems, and network equipment used to connect computers to the internet;

    b. records of Internet Protocol addresses used;

    c. records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

19. Documents, records, or information relating to email, online, or darkweb accounts including:

    a. Documents, records, or information associated with darknet monikers used in furtherance of the Subject Offenses;

    b. Documents, records, or information relating to any other email or online accounts used in furtherance of the Subject Offenses;

20. Virtual or digital or crypto currency in any format, including but not limited to, wallets (digital and paper), public keys (addresses) and private keys.

21. Any and all hidden services accounts used in furtherance of the offenses described above, including, but not limited to, darknet market accounts, associated darknet forum accounts and Tor-based email accounts.[1];

22. Any and all peer to peer (P2P) virtual currency trading platform accounts, with no legitimate or identified service provider to which legal process may be served, used in furtherance of the offenses described above, including, but not limited to, localbitcoins.com[2] accounts or bitcon-otc internet relay chat channel[3] accounts.

23. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer

---

[1] Hidden services (.onion services) are accessed through the Tor anonymity network. Most are considered dark web services with no legitimate or identified service provider to which legal process may be served.

[2] LocalBitcoins, OY (and their associated web platform, localbitcoins.com "LBC") is a Finnish company which is not a licensed money transmitting business registered with the U.S. Government and compliant with the Bank Secrecy Act, which requires establishment and maintenance of anti-money laundering (AML) programs in accordance with know your customer (KYC) rules, such as identifying persons involved in currency transactions over certain thresholds. LBC is not considered a legitimate service provider to which legal process may be served for accurate subscriber information or account seizure.

[3] Internet Relay Chat (IRC) is a decentralized chat system which enables people with an installed client (computer program which sends and receives messages to and from an IRC server via the internet) to join in live discussions with anyone else connected in the same manner. The IRC server ensures that all messages are broadcast to everyone participating in a discussion.   There can be many discussions going on at once; each one is assigned a unique channel. One such channel is #bitcoin-otc, in which virtual currency trades are negotiated and arranged. All transactions that may occur are conducted directly between counterparties, without any participation or intermediation from the hosts of IRC servers, and therefore no entity to which legal process may be served for accurate subscriber information, transactional history or account seizure.

passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the Subject Offenses.

24. For any computer, cellular telephone, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

   a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

   b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

   e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

   f. evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to the Subject Offenses under investigation and to the computer user;

   g. information about usernames or any online accounts or email addresses that include the email accounts and monikers listed in paragraph 20;

   h. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

i.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

j.  contextual information necessary to understand the evidence described in this Attachment B;

k.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

l.  any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

m.  items or evidence of items otherwise described above in paragraphs 1-24 of this Attachment B.

25. Executing law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the a device onto the Touch ID or fingerprint sensor of any Apple iPhone, iPad, or other Apple brand device, or other device that has a fingerprint sensor, in order to gain access to the contents of any such device.   Law enforcement personnel may also depress the fingerprints and/or thumbprints of persons reasonably believed to be the user(s) of the device in order to gain access to applications on the device that may be locked with a fingerprint or thumbprint.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**

I, Marc A. Soto, a Special Agent with the Homeland Security Investigations (HSI), being duly sworn, state as follows:

## INTRODUCTION

1.    I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    I am a Special Agent with Homeland Security Investigations (HSI) and have been since March 2003.   I was a Special Agent with the United States Customs Service from August 2001 to March 2003.   I was a United States Customs Inspector from September 1997 to August 2001.   I am currently stationed in Denver, Colorado, at the Denver Field Division.   I have been assigned to the Front Range Drug Task Force (FRTF).   I trained at the Federal Law Enforcement Training Center from August 2001 to December 2001 and completed the Criminal Investigator Training Program and the Customs Basic Enforcement School.   I received training in identifying and investigating controlled substances.   I also have training related to the money flow in drug trafficking cases.   I successfully completed training seminars and in service training related to drug cases.   I have participated in numerous narcotics investigations involving the illicit possession, smuggling, and sale of heroin, cocaine, methamphetamine, marijuana, and other controlled substances.   I have purchased controlled substances in an undercover capacity, directed other undercover agents and confidential sources during drug investigations, and prepared affidavits for Title III wiretaps, search and arrest warrants.

3.    Throughout my career, I have gained valuable experience investigating the ways criminal business organizations attempt to conceal financial transactions associated with their illegal enterprise, and the methods used to hide the proceeds of

illegal activity, especially when the records of their financial activities are incomplete, missing, or otherwise unavailable for review.

4.   I have also conducted and participated in criminal investigations involving complex criminal networks who engaged in money laundering, smuggling, drug trafficking, and electronic crimes. I have controlled, directed, and debriefed confidential sources and informants concerning money laundering and controlled substance violations, and have conducted consensual monitoring of telephonic, electronic, and spoken conversations. I have received extensive formal and informal training in investigative techniques that involve electronic media and computer investigations, preservation and search and seizure of electronic media as evidence and have received specialized training in the enforcement of laws concerning wire and electronic communications and successfully conducted those investigations resulting in arrests and seizures.

5.   I am familiar with the methods employed by drug smuggling and money laundering organizations to conduct their business, including, but not limited to: their methods of importing and distributing narcotics; the transportation routes and the means of coordination organizations from "source countries" used to smuggle narcotics across the U.S. border, methods that involve international and U.S. mail systems; the methods of laundering proceeds derived from the sales of controlled substances; the use of telephones, electronic devices, and other telecommunications methods to conduct drug transactions and launder drug proceeds; use of the internet, namely the "Darknet," to purchase and distribute drugs, and the use of virtual currency or cryptocurrency to facilitate illegal activity like, for example, the distribution of narcotics.

6.   I have participated in the execution of numerous search warrants and have served as the affiant and site leader for several of those warrants.

7.   Based on my professional training and my experience with this and other investigations, I am aware that individuals and businesses involved in such financial crimes maintain records of these transactions for long periods of time in places readily accessible to them, as well as maintain records of these transactions on mobile and

portable devices, cloud-based files and storage, and other digital media.   This is especially true when the crimes involve transactions in significant amounts of money. Through my training and experience, I have also learned, inter alia, that persons involved in activities such as tax, cyber, currency, money laundering, and drug trafficking crimes typically and in the ordinary course of their activities:

a.  receive business and personal information in the mail and through electronic mail (a/k/a "email") on a regular, oftentimes monthly basis, in the form of bank statements, bills and other financial documents that are relevant to a financial investigation, and that these individuals typically keep and maintain such information in secure locations, on their person, and within their containers, residences, vehicles, offices, garages, storage buildings and safe deposit boxes for ready access, and also to conceal such items from law enforcement authorities for long periods of time, even after their participation in illegal activities may have ceased;

b.  utilize in the ordinary course, inter alia, domestic and international banks and currency exchangers and their attendant services, such as bank accounts, safe deposit boxes, securities, cashier's checks, letters of credit, brokerage accounts, wire transfers, cryptocurrency, and similar banking services;

c.  use and maintain electronic equipment such as desktop computers, laptop computers, computer tablets, hardware "wallets," mobile phones, and related equipment, to generate, transfer, count, record, store and/or communicate information relevant to their activities; these digital and physical devices often store contact names, telephone numbers, recent calls, text messages, internet history, and photographs which are related to tax, cyber, currency, money laundering, and drug trafficking crimes;

d.  place assets in names other than their own to avoid detection while maintaining control of the assets, laundering money through what appears to be a legitimate business, hide money in their homes, vehicles, safes, and safe deposit boxes, use proceeds to purchase assets that are hard to trace, transfer assets into what appear to be legitimate accounts, to other individuals, and use sites like localbitcoins.com to convert proceeds to fiat currency or vice versa;

e.  maintain large amounts of United States currency and/or virtual currency in order to maintain and finance their ongoing drug trafficking and money laundering businesses;

f.   maintain in their homes and vehicles drug paraphernalia relating to the sales and distribution of controlled substances, such as plastic baggies, zip-lock baggies, cellophane and other items used for the weighing, packaging, and distribution of controlled substances for sales;

g.  possess, carry, or keep firearms and other weapons in order to protect their proceeds and drugs from discovery, theft by criminals, or confiscation by law enforcement; and

h.  keep and maintain documents including but not limited to: bank statements and related records; invoices; accounting ledgers; financial spreadsheets; notes; certificates of deposits; wire transfer confirmations; deposit slips; cashiers' checks; savings bonds; receipts; tax returns; accountants' work papers; records relative to foreign travel and contacts; signature cards; financial statements; correspondence; confirmations; passwords; access, transfer, and recovery information for electronic wallets; money drafts; letters of credit; money orders; bank drafts; bank checks; safe deposit box keys; money wrappers; utility records; shipping records; tax records; diaries; account numbers; business proposals and agreements; corporate records; partnership agreements; subscription agreements; journals; cancelled checks; and telephone records.

8.   I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important ways:   (1) the objects themselves may be instrumentalities, fruits, or evidence of a crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).

## <u>PURPOSE OF THIS AFFIDAVIT</u>

9.   This Affidavit is submitted in support of Applications for warrants to search the following locations (the "Subject Premises"):

a. **<u>LOCATION #1</u>** - A manufactured/mobile home located at 9100 Tejon Street, Pikes Peak Drive, Lot #210, Federal Heights, Colorado 80260, the known residence of PUEBLITO CORTES-DURAN.   The above address is more fully described in Attachment A to the warrant seeking to search the residence, incorporated here by reference.

b. **<u>LOCATION #2</u>** – An apartment located at 1745 West 85th Avenue, Apartment 101, Federal Heights, Colorado 80260, the known residence of MALISSA ANN SALAZ.   The above address is more fully described in Attachment A to the warrant seeking to search the residence, incorporated here by reference.

c. **<u>LOCATION #3</u>** - The business at 1748 W. 92nd Ave., Federal Heights, Colorado 80260 (hereinafter "SUBJECT BUSINESS"), named Envios La PAZ LLC, with the registered agent of SUBJECT BUSINESS being Bryan Rodriguez, as further described in Attachment A and incorporated herein by reference.

d. **TARGET VEHICLE ONE**: A 2013 white Chevrolet Camaro, bearing Colorado license plate AAEZ05, Vehicle Identification Number (VIN) 2G1FK1EJ6D9109904 and registered to Keven Alexander Perez at 1765 W. 85th Ave. #102, Federal Heights, Colorado 80260 ("TARGET VEHICLE ONE").   The vehicle is more fully described in Attachment A to the warrant seeking to search TARGET VEHICLE ONE, incorporated herein by reference.

e. **TARGET VEHICLE TWO**: A 2011 grey Kia sedan, bearing Colorado license temporary tag 1627017, VIN KNAGN4A61B5088666 and registered to Malissa Salaz at 1745 W. 85th Ave #101, Federal Heights, Colorado 80260 ("TARGET VEHICLE TWO").   The vehicle is more fully described in Attachment A to the warrant seeking to search TARGET VEHICLE TWO, incorporated herein by reference.

10.   The facts in this affidavit come from my participation in the investigation, my personal knowledge and observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   I have not intentionally excluded facts that would tend to materially undermine probable cause. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## MODUS OPERANDI OF DRUG TRAFFICKERS

11.   Based on my experience and training, continued consultation with other law enforcement officers experienced in drug and financial investigations, and the facts set forth herein, I believe that the property to be seized, as set forth in Attachment B to each requested warrant, will be found in the location to be searched, as described in Attachment A to each requested warrant, for the following reasons:

a. Individuals involved in drug dealing often maintain in their residences or vehicles records and ledgers evidencing their trafficking activities in order to keep track of the ordering purchasing, storage, distribution, and transportation of controlled substances. On numerous occasions, I have observed handwritten notes which depict drug transactions in pay-and-owe records and in customer lists complete with telephone numbers and addresses. These records, which remain to memorialize past transactions and track the status of accounts

receivable and accounts payable, are kept whether or not the individual is in actual possession of controlled substances or currency at any given moment.

b. Individuals involved in drug dealing will use their cellular telephones or computers to conduct the drug trafficking business. Often stored in the telephones' or computers' memory are contact names, telephone numbers, recent calls, text messages containing addresses and tracking numbers for parcels and other transactions, internet history, and photographs which are related to controlled substance trafficking. This is particularly so in a case like the instant investigation where the drug trafficker uses the internet, including social media accounts and messaging applications, to coordinate the sale of illegal narcotics and collection of proceeds.

c. Individuals involved in drug dealing earn large sums of money and often try to legitimize these profits. In order to do this, they may attempt to secrete, transfer, and conceal the money in several ways, including, but not limited to, the following: (1) placing assets in names other than their own to avoid detection while maintaining control of the assets, (2) laundering the money through what appears to be a legitimate business, (3) hiding the money in their homes, safes, and safety deposit boxes, (4) using the money to buy assets which are hard to trace, or (5) transferring assets into what appear to be legitimate amounts, to other individuals. Records of these transactions including banking records are often found in drug dealers' residences.

d. Individuals involved in drug trafficking must maintain on hand large amounts of United States currency and/or virtual currency in order to maintain and finance their on-going drug business. In addition, other assets generated by their drug business or purchased with the cash earned such as jewelry and negotiable/financial instruments, are typically kept by drug dealers within their residences or vehicles to avoid detection by law enforcement.

e. It is common for drug traffickers to maintain in their residences drug paraphernalia relating to the sales and distribution of controlled substances, such as plastic baggies, zip-lock baggies, cellophane, and other items used for the weighing, packaging, and distribution of controlled substances for sales. These items are also commonly found in places where controlled substances are being stored and or prepared for shipment through the U.S. Mail and other private commercial carrier systems. Individuals involved in the distribution also often have materials on hand to count and package U.S. currency.

f. Individuals involved in the distribution and sale of controlled substances commonly possess, carry, or keep firearms and other weapons in order to protect their drugs and drug-related proceeds from discovery, theft by criminals, or confiscation by law enforcement.

g. Individuals involved in the distribution and sale of controlled substances commonly utilize their vehicles as an integral part of their illegal enterprise. Such

uses include counter surveillance, the delivery of the drugs for sale, transportation of supplies and equipment necessary for the sale of the drug, packaging of the drug, protection of the drug, storage of the drugs, and as an asset for concealing the profits of their drug business. In addition, persons involved in the trafficking of controlled substances often travel by other means, to include airplane, to conduct their business and keep travel records and receipts and used airline tickets.

h.  Individuals involved in drug dealing often take, or cause to be taken, photographs of themselves and their associates, their property and their drugs, and these individuals usually maintain these photographs in their possession.

i.  Within any location searched there will often be keys that fit location locks, post office boxes, safe deposit boxes, commercial mailing receiving agency boxes, wallets, purses, diaries and luggage tags, all of which contain some personalization that tends to identify the owners, thus tending to establish the identity of persons in control of the premises, vehicles, storage areas or containers where evidence of controlled substance trafficking may be found, including utility company receipts, rental receipts, and canceled mail envelopes. In virtually all locations that I have searched, I have observed utility bills pertaining to the location, and personal letters addressed to occupants of the location.

j.  Further, in my experience, narcotics traffickers are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained, and subsequently forgotten. Hence, records that one would normally think a prudent person would destroy because of their incriminating nature of the documents, they keep. The documentary evidence most commonly seized includes telephone numbers, address books, credit cards and hotel receipts documenting travel, mobile telephone records, accounts and records in fictitious names, carbon copies of money orders and cashier's checks evidencing large cash expenditures, correspondence, and records indicating the existence of storage facilities used in narcotic trafficking. This evidence is more and more frequently found in electronic format. People conduct the ordinary affairs of life, whether making travel plans or business arrangements, using computers and electronic devices such as smart phones that operate as computers.

k.  Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).

## SEIZURE AND SEARCH OF COMPUTERS

12.  In this affidavit, the terms "computers," "digital storage media," or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

13.  As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. I am aware that modern cellular telephones, or smart phones, operate in many respects as a computer, with internet access, and function at times as a person's computer historically would have.

14.  Based on my own, and my colleagues' knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

15.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because, when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

16.  Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

17.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when they were used.

18.  The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords, and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

19.  The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

20.  Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

21.  "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chats," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

22.  I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

23.  Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been

used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

24.  Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction

25.  For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

a.  On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

b.  On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about

encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

c.  On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

26.  The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

a.  *The nature of evidence.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

b.  *The volume of evidence and time required for an examination.* Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e. *Need to review evidence over time and to maintain entirety of evidence*. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to these Applications during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your Affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of each application, the government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain

and to review the data in the control and custody of the government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

27.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

28.  I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

29.  I know from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, utility bills, mail, correspondence, and other identification documents.

30. I know from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include identification documents, bills, and receipts.

31. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.   These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

32. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.   Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.

33. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a

fingerprint alone.   If the operating system is version 9.3 or later, that time frame shrinks to 8 hours.

34.  Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

35.  In addition, I know in my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel phones and Google Pixel XL phones have a fingerprint sensor that can be used to unlock the device.   Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

36.  Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

37.  Further, if a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

38.  Similarly, if a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

39.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

40.  As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to

law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant

41.  Due to the foregoing, I am informing the Court that if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, law enforcement personnel intends to obtain from PUEBLITO CORTES-DURAN and MALISSA ANN SALAZ the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the above-named individuals to the fingerprint scanner of the device(s) found at the Subject Premises; (2) hold the device(s) found at the Subject Premises in front of the face of the above-named individuals to activate the facial recognition feature; and/or (3) hold the device(s) found at the Subject Premises in front of the face of the above-named individuals to activate the iris recognition feature, for the purpose of unlocking the device(s) in order to search the contents as authorized by this warrant.

## FINANCIAL CRIMES ENFORCEMENT NETWORK

42.  The following guidance was provided by the Financial Enforcement Crimes Network (FinCEN). I am familiar with FinCEN's guidance, and the below information, from training and from my experience as an investigator.

   a. In 2011, FinCEN issued a final rule ("2011 MSB Final Rule") defining a money services business ("MSB") as, "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States," operating directly, or through an agent, agency, branch, or office, who functions as, among other things, a "money transmitter."

   b. FinCEN's regulations define the term "money transmitter" to include a "person that provides money transmission services," or "any other person engaged in the transfer of funds."

c.  The term "money transmission services" is defined by FinCEN to mean the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.

d.  The Bank Secrecy Act ("BSA") regulatory framework begins with the expectation that financial institutions will operate under a culture of compliance supported by senior leadership, including owners, boards of directors, and senior executives. This culture of compliance will dictate the basic norms of behavior, knowledge, and transparency under which the management team, employees, and service providers will be held accountable.

e.  The BSA and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering program ("AML program") that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities. The AML program must, at a minimum: (a) incorporate policies, procedures and internal controls reasonably designed to assure ongoing compliance (including verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests); (b) designate an individual responsible to assure day-to-day compliance with the program and BSA requirements; (c) provide training for approved personnel, including training in the detection of suspicious transactions; and, (d) provide for independent review to monitor and maintain an adequate program.

f.  The AML program must be approved by the owner of the financial institution, or by the owner's representative (in the case of a corporation, such representative is the Board of Directors). To assure that an AML compliance program is reasonably designed to meet the requirements of the BSA, MSBs should structure their programs to be risk-based. According to FinCEN MSBs should assess their individual exposure to the risk of money laundering, terrorism finance, and financial crime based on the composition of customer base, the geographies served, and the financial products and services offered. MSBs must properly manage customer relationships and effectively mitigate risks by implementing controls commensurate with those risks.

g.  A well-developed risk assessment is part of sound risk management and assists MSBs in identifying and providing a comprehensive analysis of their individual risk profile. As part of its risk assessment, an MSB should determine both the identity and the profile of its customers, and MSBs must know enough about their customers to be able to determine the risk level they represent to the institution.

***Overview of a Wire Transfer***

43.  Corporate MSBs often contract through numerous agents to provide wire transfer services. (NOTE: The term "wire transfer" is used throughout this affidavit. "Wire transfer" should be understood to be a money transfer through an MSB as opposed to a transfer through a traditional bank). As an example from this investigation, Envios La Paz is a corporate MSB and serves as their agent.

44.  In the typical transaction, the wire transfer process begins when a customer (sender) enters into an authorized MSB agent for the purpose of sending money to a receiver (beneficiary).

45.  The MSB agent is either connected to their corporate MSB via a computer terminal or by a direct telephonic connection (often a red phone as described herein).

46.  The customer provides their own name, address, and telephone number. The customer also provides the name of the receiver (beneficiary) of the wire transfer, as well as the receiver's city, state, and country.

47.  The customer will either provide this information directly to an employee at the MSB agent location for the employee to enter it into the corporate MSB computer system, or the customer uses the red telephone at the sending agent location to speak directly with an operator who works for the corporate MSB; either way the same result is achieved.

48.  After the information is collected, the sender provides the principal amount to be transferred, including the send fee, in cash to the MSB agent. The fee for a wire transfer from the United States to Mexico is often $10. The sender is then provided a receipt containing all of the provided information plus the date and time the transfer was sent and a unique transaction number sometimes called an MTCN (Money Transfer Control Number). This MTCN number is provided by the customer to the intended beneficiary and is required for the wire transfer to be paid out in Mexico.

49. MSB agents must provide the corporate MSB with the cash they have collected from conducting wire transfers for customers. MSB agents generally provide this cash through bank deposits.

50. According to the BSA and its implementing regulations, MSB agents that provide money transfer services must obtain and record specific information for each money transfer of $3,000 or more, regardless of the method of payment.   Many corporate MSBs impose more stringent requirements upon their agents and require them to maintain the sender's information for lower dollar transactions—such as any transaction above $1,000.

51. The corporate MSB relies upon their contracted MSB agents to follow anti-money laundering corporate policies and state and federal laws and regulations.

### MSB Money Laundering and the "Many to Many" Scheme

52. The Arizona Attorney General maintains a centralized searchable database of the financial transactions of global MSBs. This database is maintained by analyst and law enforcement professionals recognized as experts in money laundering activity. This database provides data, meaningful data analysis, collaboration and training to investigators, analysts, and prosecutors nationwide in their efforts to disrupt criminal organizations and dismantle their operations.

53. The analysis of transaction data supplied by multiple MSBs over a period of time reveals the preferred and most often frequented MSBs by organized criminals; the data further reveals potential vulnerabilities in AML programs of participating MSBs.

54. Based on my experience, research, and consultation with other law enforcement officers, I know it is common for drug trafficking organizations to use recording and paying agent locations of MSBs to launder probable heroin, fentanyl and methamphetamine proceeds from U.S. distribution cities to drug source cities in Mexico. An Intelligence Report issued by the Arizona Attorney General ("AAG") in March of 2019 titled, "Money Transmission Techniques Used in the Sinaloa Corridor," revealed three overarching techniques utilized by drug traffickers to remit cash through MSBs to

sources in Sinaloa, Mexico. Two of the techniques, "Many to One," defined as many sender names sending to one recipient name; and "One to Many," defined as one sender name to many recipient names, were discussed in detail in a December - Intelligence Report issued by the AAG which was titled, "Correlation Between U.S. Heroin Markets and Money Transfer Payments to Mexico Source Areas."

55. MSB anti-money laundering compliance systems, as currently designed, detect and interdict high risk frequent payouts to one recipient from multiple senders or the inverse—high frequency transfers from one sender to many payees. The third money laundering technique referenced above involves money transfers from many non-repetitive sender names to many different payee names in a defined high risk corridor (otherwise known as the "Many to Many" typology). Automated tools designed to detect the "Many to Many" typology have not as yet been developed by the MSB industry.

56. As an example of the "Many to Many" typology, AAG financial analysts received information from law enforcement in early March 2019 about an arrested suspect in Phoenix, Arizona who was found in possession of approximately 80 MSB transaction receipts and over two pounds of heroin. The seized money transfer receipts were analyzed and revealed only two recording agents in the Phoenix metropolitan area which had sent approximately $80,000 in money transfers over a two day period. Subsequent investigation of the two recording agent locations and analysis of several months of transaction activity revealed the agent owners were working directly with heroin trafficking organizations in the Phoenix metro area by structuring bulk drug cash into outbound money transfers. The bulk cash structuring methodology employed by the two associated recording agents to circumvent AML compliance systems and analytics was subsequently named "Many to Many" by AAG analysts.

### *"Many to Many" Emerging Risk*

57. The "Many to Many" money laundering typology remains very difficult to detect by law enforcement and MSB compliance analysts because it involves transactions intentionally structured with non-repetitive sender and payee names and

associated identities. Multiple recent law enforcement investigations revealed complicit recording agents receiving bulk cash deliveries from drug cash couriers along with lists of payee names and locations to whom transfers are to be sent. The common definition of "complicit" is: "involved with others in an illegal activity or wrongdoing." Based on my experience, research, and consultation with other law enforcement officers, I am aware that as cash accumulates from drug sales in distribution cities, couriers transport portions of the cash to complicit recording agents along with lists of payee names located in Mexico drug source cities. Recording agents collaborate with traffickers by fabricating different unique sender names and identities for every unique payee name. Those sender identities are often used no more than twice and then never appear again in transaction activity—all making it difficult for law enforcement to track and analyze. Involved recording agents then structure the falsified transactions to be just below the corporate MSB's identification threshold, which in turn enables the recording agent to send the most cash per transaction without also fabricating a fake government ID number. The involved recording agents in turn are required to provide cash couriers with receipts for each completed transaction in order to receive their fees and to prove the cash was sent as directed. Corrupt recording agents are anxious to receive more deliveries of cash and payee name lists because they receive an agreed upon fee from traffickers for each sent money transfer. The drug cash couriers then send images of the receipts to traffickers in the intended payout cities in Mexico. Traffickers in drug source locations then collaborate with complicit paying agents by providing the transaction receipts including the money transfer reference numbers. Complicit paying agents then simply pay out the transfers sent to various payee names to a trafficker in drug source locations.

58.  Using the "Many to Many" method, the sending and paying agent locations are not knowingly working directly with one another but are instead individually complicit with drug traffickers operating in their respective areas. The "Many to Many" money laundering method is sophisticated and designed to function more clandestinely than the other "One to Many" or "Many to One" methods, which are also simultaneously detected in high risk corridors.

**PROBABLE CAUSE**

59.   I submit that the facts contained herein show there is probable cause to believe that PUEBLITO CORTES-DURAN and MALISSA ANN SALAZ; and others known and unknown, have committed, are committing, and will continue to commit the following offenses:   Title 21, United States Code, Section 841, Distribution and Possession with Intent to Distribute a Controlled Substance; Title 21, United States Code, Section 846, Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance; and Title 18, United States Code, Sections 1956 and 1957, Money Laundering (collectively, the Target Offenses).

60.  There is probable cause to believe that the items and places described in Attachment A to each requested warrant will contain evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846; and Title 18, United States Code, Sections 1956 and 1957, as more fully described in Attachment B to each requested warrant, which is attached hereto and incorporated herein by reference.

61.  On January 23, 2020, a grand jury in the United States District Court for the District of Colorado returned an indictment (Docket No. 20-cr-00025-PAB) charging the individuals named above with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846.

**THE SUBJECT PREMISES**

62.  **LOCATION #1** is the residence of PUEBLITO CORTES-DURAN, confirmed by physical and electronic surveillance.

a.  On November 22, 2019, at approximately 10:51 AM, for example, law enforcement conducted surveillance at the Lamplighter Manufactured Home Park located at 9100 Tejon Street, Federal Heights, Colorado.   Law enforcement observed TARGET VEHICLE ONE parked in front of the north end of the

manufactured home with the number 210 on the side of the home.   This vehicle has been identified from previous surveillances as the vehicle CORTES-DURAN is currently driving.

b. On November 29, 2019, at approximately 09:00 PM, law enforcement conducted surveillance at the Lamplighter Manufactured Home Park located at 9100 Tejon Street, Federal Heights, Colorado and observed TARGET VEHICLE ONE parked in the driveway of a manufactured home with the number 210 on the side of the home.   On the date mentioned above, I observed TARGET VEHICLE ONEs light come on as I approached number 210 and observed CORTES-DURAN exit the front door of number 210 and walked towards TARGET VEHICLE ONE.   Also parked in the driveway was a 2004 white Lexus 470 SUV with Colorado Temporary License Plate 1422263.   Records checks indicated that the 2004 Lexus was registered to CORTES-DURAN at 1500 W. Thornton Parkway, Thornton, Colorado.

c. A review of various GPS data points from PUEBLITO CORTES-DURAN's cellular telephone number 970-652-7633, on February 9 and 10, between 12:00 AM to 08:00 AM, indicated that cellular telephone number 970-652-7633 was located in the vicinity of 9100 Tejon Street, Federal Heights, Colorado 80260.

d. As described above, **TARGET VEHICLE ONE** is often parked at LOCATION #1.

63. **LOCATION #2** is MALISSA ANN SALAZ's residence, as confirmed by records checks and physical surveillance.


a. A review of the Colorado Driver's License database, for example, indicated that the mailing address for SALAZ is listed as 1745 W 85th Ave, Apt 101, Federal Heights, Colorado 80260.

b. On February 3, 2020, after a controlled purchase of three (3) pounds of methamphetamine, law enforcement surveilled SALAZ to the SUBJECT BUSINESS.   This business is known to be associated with CORTES-DURAN.   SALAZ was observed exiting her vehicle and she entered Envios La Paz.   Approximately 30 seconds later, SALAZ exited Envios La Paz, got into her vehicle, and drove to her residence located at 1745 W. 85th Ave., Federal Heights, Colorado.

c. On February 6, 2020, law enforcement conducted surveillance of SALAZ in the vicinity of 1745 West 85th Avenue, Federal Heights, Colorado 80260.   At approximately 9:00AM, law enforcement surveillance observed SALAZ exit building 8, apartment 101 at 1745 West 85th Avenue, Federal Heights, Colorado 80260.

d. **TARGET VEHICLE TWO** is regularly parked in the parking lot of LOCATION #2.

64. **LOCATION #3** is a business in the name of CORTES-DURAN's son, but believed to be operated in fact by CORTES-DURAN.   As detailed below, LOCATION #3 is believed to be a site in which CORTES-DURAN and others engage in money laundering.

## CURRENT INVESTIGATION

### *Opening of the Investigation and Confidential Human Sources*

65. As described below, an investigation into CANDELARIA VALLEJO-GALLO (hereinafter "VALLEJO-GALLO") and a drug trafficking organization she operates (the "VALLEJO DTO") regarding violations of those statutes, among others, led investigators to identify CORTES-DURAN as a multi-pound methamphetamine and heroin distributor in the Denver metro area.   Investigators learned that CORTES-DURAN utilizes SALAZ as a courier for the sale of methamphetamine and heroin.

66. In December 2018, two confidential human sources (hereinafter "CHS-1" and "CHS-2") provided information that CORTES-DURAN was working with VALLEJO-GALLO distributing methamphetamine and heroin in the Denver metro area.   CHS-2 identified VALLEJO-GALLO as a regional transportation coordinator of methamphetamine, heroin, and cocaine for the Sinaloa Cartel.

67. CHS-1 was opened as a confidential human source in October 2017.   CHS-1 has previously provided reliable information in multiple different ongoing investigations.   Much of the information CHS-1 has provided has been corroborated by law enforcement.   CHS-1 began working for the FBI in hopes of continuing to reside in the United States and also for monetary compensation.   CHS-1 has been part of controlled purchases of methamphetamine and heroin as part of the ongoing investigation.   CHS-1 is not actively involved with the activities of the VALLEJO DTO

beyond the controlled purchases.   CHS-1 has a criminal history which includes Driving Under the Influence, Driving Without a License, and Previously Removed Alien.   CHS-1 directed Agents to CHS-2.

68.   CHS-2 was opened as a confidential human source in December 2018. CHS-2 has provided reliable information in this ongoing investigation.   Much of the information provided by CHS-2 has been corroborated by law enforcement.   CHS-2 began working for the FBI in hopes of assisting with CHS-1's immigration status and also for monetary compensation.   CHS-2 is a social acquaintance of VALLEJO-GALLO.   CHS-2 has been propositioned by VALLEJO-GALLO to drive load runs for the VALLEJO DTO from Los Angeles, California to Denver, Colorado.   CHS-2 has also been involved in multiple controlled purchases of methamphetamine and has assisted in the identification of ISAIAS CAMPOS-RUTIAGA as one of VALLEJO-GALLO's sources of supply for methamphetamine.

### *Controlled Purchases*

69.   Since March 2019, the CHSs (CHS1 and CHS2) have conducted five (5) controlled purchases of methamphetamine with the VALLEJO DTO involving CORTES-DURAN and SALAZ, facilitated by CORTES-DURAN.   Those purchases are summarized in the chart below

| # | Date | Drug Purchased (Quantity) | Delivery Made By |
|---|------|---------------------------|------------------|
| 1 | 03/06/19 | Heroin (176.1g) – DEA Laboratory measured weight | PUEBLITO CORTES-DURAN |
| 2 | 04/16/19 | Methamphetamine (395.6g) – DEA Laboratory measured weight | PUEBLITO CORTES-DURAN |
| 3 | 09/25/19 | Methamphetamine (1137 g) – DEA Laboratory measured weight | MALISSA SALAZ |
| 4 | 10/10/19 | Methamphetamine (446 g) – DEA Laboratory measured weight | MALISSA SALAZ |
| 5 | 02/03/20 | Methamphetamine (1429.5 g) – FBI measured weight | MALISSA SALAZ |

***Controlled Purchase #1: 176.1 Grams of Heroin***

70.  On March 5, 2019, CHS-1 and CHS-2 contacted VALLEJO-GALLO in order to arrange a meeting to discuss narcotics transactions.   The purpose of the meeting was to inform VALLEJO-GALLO that CHS-1 and CHS-2 wanted to purchase narcotics from VALLEJO-GALLO.   CHS-2 has had a friendship with VALLEJO-GALLO but had not been involved with VALLEJO-GALLO and her drug distribution until the proposition was provided to VALLEJO-GALLO on March 5, 2019.

71.  On March 6, 2019, Special Agents from the FBI directed CHS-1 and CHS-2 to arrange for a controlled purchase of approximately seven ounces of suspected heroin from VALLEJO-GALLO.   CHS-1 and CHS-2 were provided with $6,000 in official agency funds.   CHS-1 and CHS-2 were searched for contraband and money with negative results.   CHS-1 and CHS-2 were also provided with an audio/recording device which was activated.

72.  At approximately 3:33 p.m., CHS-1 and CHS-2 traveled to VALLEJO-GALLO's residence, 1272 Quari Street, Aurora, Colorado.   They entered the residence. VALLEJO-GALLO and CORTES-DURAN were present.   CHS-1 and CHS-2 attempted to purchase the heroin from VALLEJO-GALLO at that time.   VALLEJO-GALLO informed them that the heroin was stored at a different location and that VALLEJO-GALLO would have the heroin delivered to CHS-1 and CHS-2 later that day.   During the conversation CHS-1 and CHS-2 had with VALLEJO-GALLO, CHS-1 and CHS-2 observed CORTES-DURAN retrieve a package, believed to contain methamphetamine, from VALLEJO-GALLO's closet.   CORTES-DURAN then departed the residence with the suspected methamphetamine.   VALLEJO-GALLO also informed CHS-1 and CHS-2 to purchase a new cellular telephone and return to her residence.   CHS-1 and CHS-2 departed the residence.

73.  CHS-1 and CHS-2 met with FBI SAs Jordan Kuretich and Maureen Gibson. The recording devices were deactivated.   CHS-1 and CHS-2 returned the $6,000 in official agency funds.   A new cellular telephone was purchased for CHS-1 and CHS-2.

At approximately 5:14 p.m., CHS-1 and CHS-2 returned to VALLEJO-GALLO's residence.   CHS-2 entered the residence and provided VALLEJO-GALLO with the new telephone number.   A short time later, CHS-2 exited the residence and CHS-1 and CHS-2 exited the area and met up with SAs Kuretich and Gibson.

74.   At approximately 6:40 p.m., Agents met with CHS-1 and provided CHS-1 with the $6,000 in official agency funds and an audio/video recording device that was not activated at that time.     Physical surveillance of 1272 Quari Street, Aurora, Colorado was also being conducted.   At approximately 7:10 p.m., a silver Lexus sedan bearing Colorado temporary license plate 72622 was observed departing 1272 Quari Street.   At approximately 7:19 p.m., the silver Lexus arrived at Carniceria Compadre, 541 Sable Boulevard, Aurora, Colorado. The vehicle parked with nobody exiting the vehicle.   At approximately 7:32 p.m., a silver Mazda sedan bearing Colorado license plate UOC835 parked directly behind the silver Lexus.   A Hispanic male wearing a black jacket with the hood pulled up covering the subjects head exited the Mazda with a white grocery bag in his hand.   The Hispanic male entered the silver Lexus on the passenger side.   After a short time period, the Hispanic male exited the silver Lexus without the white grocery bag and entered the silver Mazda.   Both the silver Lexus and silver Mazda departed the area.

75.   At approximately 7:41 p.m., the silver Lexus arrived at the meet location that CHS-1 and CHS-2 had previously provided VALLEJO-GALLO.   At approximately 7:53 p.m., CORTES-DURAN was observed exiting the silver Lexus and walking into the meet location.   At 7:54 p.m., Agents remotely activated the audio/video recording device previously provided to CHS-1.   At 7:57 p.m., CORTES-DURAN exited the meet location and departed the area.

76.   Agents met with CHS-1.   The audio/video recording devices were deactivated at that time.   CHS-2 provided the Agents with $400 in official agency funds. CHS-1 was debriefed and advised that CORTES-DURAN arrived at the meet location and provided CHS-1 with the suspected heroin that was in a white grocery bag.   CHS-1

provided CORTES-DURAN with $5,600 in official agency funds in exchange for the heroin.   The DEA Western Laboratory tested the substance and found the presence of heroin in 176.1 grams of substance.

77.  Based on my training, experience, and knowledge of the investigation, I believe VALLEJO-GALLO instructed CORTES-DURAN to obtain the heroin for CHS-1 and CHS-2.   I believe CORTES-DURAN met with the Hispanic male in the silver Mazda and obtained the heroin from the unknown male.   I believe CORTES-DURAN then traveled to the meet location where CORTES-DURAN provided CHS-1 the heroin.

### Controlled Purchase #2: One Pound of Methamphetamine

78.  On April 16, 2019, Agents conducted a controlled purchase of suspected methamphetamine from CORTES-DURAN directly.    The telephone call to arrange the purchase with CORTES-DURAN by CHS-2 was recorded by agents.   CHS-2 arranged the controlled purchase of one pound of methamphetamine for $2,200.   CHS-2 met with SA Gibson and SA Kuretich.   CHS-2 and CHS-2's vehicle was searched for contraband and money with negative results.   CHS-2 was provided with $2,200 in official agency funds.   CHS-2 was provided with an audio/recording device which was activated at approximately 4:04 p.m.

79.  At approximately 4:05 p.m., CHS-2 departed the staging area enroute to the meet location, Mi Pueblo Market, 15585 E. Colfax Avenue, Aurora, Colorado.   CHS-2 was in telephonic contact with CORTES-DURAN.   At approximately 4:30 p.m., CHS-2 arrived at Mi Pueblo Market.   CORTES-DURAN was observed walking in the parking lot of the store.   CORTES-DURAN entered CHS-2's vehicle.   CHS-2, with CORTES-DURAN in the vehicle, parked next to a silver Lexus sedan bearing Colorado temporary license plate 726222, which had been previously observed by law enforcement during the March 6, 2019 heroin purchase.   CORTES-DURAN exited CHS-2's vehicle and entered the silver Lexus momentarily and then re-entered CHS-2's vehicle.   At approximately 4:33 p.m., CORTES-DURAN exited CHS-2's vehicle and departed the area in the silver Lexus.   CHS-2 departed the area and met with Agents.

80.  At approximately 4:44 p.m., CHS-2 met with SA Gibson and SA Kuretich. The audio/video recording device was deactivated.   CHS-2 provided SA Gibson and SA Kuretich with a plastic grocery bag that contained the suspected methamphetamine. CHS-2 and CHS-2's vehicle was searched for contraband and money with negative results.   CHS-2 advised that CORTES-DURAN provided CHS-2 with the plastic grocery bag containing the suspected methamphetamine and CHS-2 provided CORTES-DURAN with the $2,200 in official agency funds.   The DEA Western Laboratory tested the substance and found that it was 395.6 grams of 99% pure methamphetamine.

***Controlled Purchase #3: Three Pounds of Methamphetamine***

81.    On September 25, 2019, SA Gibson had telephonic contact with CHS-1. CHS-1 informed SA Gibson that CORTES-DURAN told CHS-1 that she, CORTES-DURAN, would be ready with the methamphetamine to sell to CHS-1 on Friday, September 27, 2019.   CHS-1 then stated the methamphetamine deal with CORTES-DURAN was arranged using cellular phone number (970) 617-7674.   CORTES-DURAN had previously not responded to CHS-1, but CHS-1 believed that CORTES-DURAN wants customers that buy more than one pound of methamphetamine.   This information was validated when CHS-1 requested three "bottles of water" and CORTES-DURAN responded and told CHS-1 she would have methamphetamine available. Methamphetamine is referred to as "agua" or water, and bottles are typically pounds in coded drug language.

82.  On September 27, 2019, CORTES-DURAN informed CHS-1 that she had three pounds of methamphetamine to sell to CHS-1.   SA Gibson and SA Kuretich recorded the telephonic call between CORTES-DURAN and CHS-1 discussing the purchase of the three pounds of methamphetamine.

83.  CHS-1 met with SA Gibson and SA Kuretich at a staging area.   CHS-1 and CHS-1's vehicle were searched for contraband and money with negative results.   CHS-1 was provided with $6,600 in official agency funds and a recording device.   The

recording device was switched on.   Later that day, CHS-1 arrived at a location dictated by CORTES-DURAN.   Agents observed a white female, later identified as SALAZ, walk over to the vehicle CHS-1 was in, enter, and sit on the front passenger side.   After the purchase of the methamphetamine was conducted, SALAZ was observed by agents exiting and walking away on foot from CHS-1's vehicle.

84.  CHS-1 then met with SA Gibson and SA Kuretich.   The recording device was deactivated.   CHS-1 stated that SALAZ got in the front of the vehicle he/she was in, placed a paper bag in the back of car, took the cash, and left.     CHS-1 provided SA Gibson and SA Kuretich with a paper bag that contained the suspected methamphetamine.   CHS-1 and CHS-1's vehicle was searched for contraband and money with negative results.   CHS-1 advised that the SALAZ provided CHS-1 with the paper bag containing the suspected methamphetamine and CHS-1 provided the white female with the $6,600 in official agency funds.

85.  The DEA Western Laboratory tested the substance, finding that it was 1337 grams of 99% pure methamphetamine.

86.  An administrative subpoena was then served to T-Mobile to obtain the call records for (970) 617-7674 for September 25, 2019.   Call records showed CHS-1's contact with (970) 617-7674 to arrange the location and time for the drug sale was close in time with (970) 617-7674 then contacting 720-940-1185.   An administrative subpoena was then served to Sprint to obtain the subscriber information for 720-940-1185 and the subscriber information came back to SALAZ.   Agents then queried SALAZ for a Colorado Driver's License and found her information along with her Colorado Driver's License photo.   The Colorado License photo matched the person, SALAZ, who conducted the methamphetamine sale with CHS-1.

87.  On October 2, 2019, the Honorable N. Reid Neuriter, a United States Magistrate Judge for the District of Colorado, authorized a warrant for the seizure of location information, pen register/trap-and-trace information, and historical call detail

records for the cellular telephone assigned (970) 617-7674.

88. On October 3, 2019, CHS-1 made a telephonic call to the (970) 617-7674 to set up a purchase of one pound of methamphetamine from CORTES-DURAN.   SA Gibson and I were present and recorded the call CHS-1 made to CORTES-DURAN. The telephonic phone call went straight to a digital message that stated, "The person you are calling isn't accepting calls at this time" indicating that CORTES-DURAN wasn't taking telephonic calls at this cellular phone number.

89. Records collected pursuant to the October 2, 2019 warrant mentioned above showed that call volume decreased markedly for (970) 617-7674 as of October 3, 2019.

90. Later on October 3, 2019, CHS-1 contacted CORTES-DURAN via the WhatsApp text messaging application and asked CORTES-DURAN if she changed her cellular phone number and CHS-1 stated he/she "needed" something (methamphetamine) next week.   CORTES-DURAN responded by WhatsApp text message that she would send CHS-1 her new cellular phone number.   The next WhatsApp text message from CORTES-DURAN was her new cellular phone number, which was (970) 880-3437.   After CHS-1 received (970) 880-3437, CHS-1 sent a message to CORTES-DURAN that he/she would contact CORTES-DURAN the following week to arrange the purchase of methamphetamine.

### *Controlled Purchase #4: One Pound of Methamphetamine*

91. On October 10, 2019, CHS-1 called (970) 880-3437 to set up a purchase of one pound of methamphetamine from CORTES-DURAN.   SA Gibson and I were present and recorded the call CHS-1 made to CORTES-DURAN.   CHS-1 informed SA Gibson that CORTES-DURAN told CHS-1 that she, CORTES-DURAN, would be ready with the methamphetamine to sell to CHS-1 later that day.   CHS-1 then stated the methamphetamine deal with CORTES-DURAN was arranged using (970) 880-3437.

92. CHS-1 met with SA Gibson, SA Kuretich, and me at a staging area.   CHS-1

and CHS-1's vehicle was searched for contraband and money with negative results. CHS-1 was provided with $2,200 in official agency funds and a recording device. The recording device was switched on. Later that day, CHS-1 arrived at a location dictated by CORTES-DURAN. Agents observed a white Jeep with Colorado Temporary license plate 1295199 arrive at the location CHS-1 was at and this temporary license plate came back registered to SALAZ at 1800 W. 85th Ave. #102, Bldg. 10, Denver, CO. SALAZ was then observed by Task Force Officer (TFO) Nic Figueroa walking over to the vehicle CHS-1 was in and went to the passenger side. SALAZ stayed outside the vehicle CHS-1 was in and conducted the purchase of methamphetamine. Agents then observed SALAZ enter the white Jeep with Colorado Temporary license plate 1295199 and exited the area.

93. CHS-1 met with SA Gibson, SA Kuretich, and me. The recording device was deactivated. CHS-1 stated that SALAZ went to the front passenger side door of the vehicle he/she was in, took a paper bag out of her jacket and handed it to CHS-1. SALAZ then took the cash and left. CHS-1 provided SA Gibson and SA Kuretich with a paper bag that contained the suspected methamphetamine. CHS-1 and CHS-1's vehicle was searched for contraband and money with negative results. CHS-1 advised that SALAZ provided CHS-1 with the paper bag containing the suspected methamphetamine and CHS-1 provided SALAZ with the $2,200 in official agency funds.

94. The DEA Western Laboratory tested the substance, finding that it was 446 grams of 99% pure methamphetamine.

95. An administrative subpoena was then served to T-Mobile to obtain call records for (970) 880-3437 for October 10, 2019. Call records showed CHS-1's contact (970) 880-3437 to arrange the location and time for the drug sale was close in time to (970) 880-3437 then contacting (720) 940-1185. A previous administrative subpoena that was served to Sprint to obtain the subscriber information for (720) 940-1185 showed it was subscribed to SALAZ.

***Suspected Money Laundering Transactions at the SUBJECT BUSINESS***

96.  On October 9, 2019, the Honorable N. Reid Neuriter, a United States Magistrate Judge for the District of Colorado, authorized a warrant for the seizure of location information, pen register/trap-and-trace information, and historical call detail records for CORTES-DURAN's previous cellular phone (970-880-3437).   From the date mentioned above, location information has shown 970-880-3437 at 1765 W. 85th Ave., Federal Heights, Colorado 80260, which is the address for SALAZ.   Location information also showed 970-880-3437 at a business called Envios Fiesta located at 1748 W. 92nd Ave., Federal Heights, Colorado 80260.   This business is a money remitter/transfer business and sells party items (pinatas, party streamers, etc.). Information was previously received from Denver DEA/Strike Force that CORTES-DURAN owned a business in Federal Heights, Colorado, to help launder the drug proceeds she obtains from the sale of drugs in the Denver, Colorado, Metro Area.

97.  On January 9, 2020, law enforcement officers observed construction workers at the SUBJECT BUSINESS changing the name from Envios Fiesta to Envios La Paz. On the date mentioned above, law enforcement officers observed CORTES-DURAN at the business talking to the construction workers and then she exited the SUBJECT BUSINESS in TARGET VEHICLE ONE.

 

*(Photos of CORTES-DURAN leaving the SUBJECT BUSINESS on January 9,2020)*

98. I then queried Envios Fiesta in the Colorado Secretary of State Business website and discovered the registered agent of this business was Victor Rosas-Trujillo. I then knew from speaking with other agents involved in this investigation that Rosas-Trujillo was the son of CORTES-DURAN.   This information came from surveillance and immigration queries on CORTES-DURAN that showed she has listed Rosas-Trujillo as her son.   Rosas-Trujillo also has similar mailing addresses used by CORTES-DURAN. I also queried Envios La Paz and discovered that Bryan Rodriguez was listed at the registered agent.   Rodriguez is also a son of CORTES-DURAN and this information came from surveillance and immigration queries on CORTES-DURAN.

99. On January 16, 2020, I received the internal case file from TCF National Bank (TCF) for suspicious money activities of the SUBJECT BUSINESS.   From July 6, 2018 through November 29, 2019, TCF had an internal investigation on $76,400.00 in suspicious cash deposit activity that funded $66,679.71 in suspicious check payment and cash withdrawal activity giving the appearance of structuring to avoid the filing Currency Transaction Report (CTR).   Some of the cash deposits and withdrawals were conducted in amounts just below the filing threshold of $10,000.01, and others were conducted on consecutive and near consecutive days in amounts individually below but in aggregates exceeding the filing threshold.

100.   During the review period in account number 8877427298 (business checking), there were twelve suspicious cash deposits, totaling $76,400.00, ranging in amounts from $1,500.00 to $9,800.00. This activity funded one suspicious cash withdrawal in the amount of $7,000.00, and 22 check payments totaling $36,603.70, ranging in amounts from $600.00 to $3,253.70.   Corporate ownership small business checking account number 8877427298 was opened on 10/24/2018 in the name of Fiesta Envios LLC with authorized signers Laura Iveth Solano and Victor Humberto Rosas Trujillo (Trujillo is the son of CORTES-DURAN).

101. Below are the structuring transactions by the SUBJECT BUSINESS:

a. On 03/18/2019, in account number 8877427298, a cash deposit in the amount of $9,800.00 occurred at TCF 96th & Washington.

b. On 03/22/2019, in account number 8877427298, a cash deposit in the amount of $9,500.00 occurred at TCF 96th & Washington.

c. On 06/27/2019, account number 8877427298, check number 1109 in the amount of $3,253.70 was made payable to National Sales Corp, with the memo line of 106714. This check returned on 06/28/2019 due to reason of Non-Sufficient Funds (NSF).

d. On 07/02/2019, in account number 8877427298, check number 9025 in the amount of $500.00 was made payable to Callahan & Palmer, with the memo line of CLM#A-902076-UNIDOS. This check returned on 07/03/2019 due to reason of NSF.

e. On 07/12/2019, in account number 8877427298, a cash deposit in the amount of $9,900.00 occurred at TCF 96th & Washington.

f. On 07/13/2019, in account number 8877427298, a cash deposit in the amount of $3,000.00 occurred at TCF 96th & Washington.

g. On 07/15/2019, in account number 8877427298, a cash deposit in the amount of $5,000.00 occurred at TCF 96th & Washington.

h. On 07/19/2019, in account number 8877427298, a cash deposit in the amount of $8,000.00 occurred at TCF 96th & Washington.

i. On 11/27/2019, in account number 8877427298, check number 1210 in the amount of $1,900.00 was made payable to Claudia Martine. This check retuned on 11/29/2019 due to reason of NSF.

j. On 11/27/2019, in account number 8877427298, check number 1214 in the amount of $1,850.00 was made payable to Maria Solano. This check retuned on 11/29/2019 due to reason of NSF.

k. On 11/27/2019, in account number 8877427298, check number 1213 in the amount of $1,700.00 was made payable to Sofia Cruz. This check retuned on 11/29/2019 due to reason of NSF.

| Date | Account | Amount In | Amount Out | Bank | Branch | Transaction | Teller | Check Number |
|------|---------|-----------|------------|------|--------|-------------|--------|--------------|
| 7/30/2019 | 8877427306 | $0.00 | $6,000.00 | 087 | 00030 | CASH WITHDRAWAL | 28189 | |
| 8/2/2019 | 8877427306 | $0.00 | $6,300.00 | 087 | 00030 | CASH WITHDRAWAL | 26473 | |
| 8/2/2019 | 8877427306 | $0.00 | $3,700.00 | 087 | 00030 | OBC PURCHASE | 26473 | 402170588; 402170587 |
| 8/5/2019 | 8877427306 | $0.00 | $8,500.00 | 087 | 00030 | CASH WITHDRAWAL | 28189 | |
| 8/9/2019 | 8877427306 | $0.00 | $3,000.00 | 087 | 00030 | CASH WITHDRAWAL | 28189 | |
| 8/13/2019 | 8877427306 | $0.00 | $4,500.00 | 087 | 00030 | CASH WITHDRAWAL | 26835 | |
| 8/16/2019 | 8877427306 | $0.00 | $5,000.00 | 087 | 00030 | CASH WITHDRAWAL | 26473 | |
| 8/20/2019 | 8877427306 | $0.00 | $5,000.00 | 087 | 00030 | CASH WITHDRAWAL | 28189 | |
| 8/20/2019 | 8877427306 | $0.00 | $8,000.00 | 087 | 00030 | OBC PURCHASE | 28189 | 402170639 |
| 8/27/2019 | 8877427306 | $0.00 | $10,000.00 | 087 | 00030 | CASH WITHDRAWAL | 26473 | |
| 9/3/2019 | 8877427306 | $0.00 | $2,069.81 | 087 | 00030 | CASH WITHDRAWAL | 26274 | |
| 9/3/2019 | 8877427306 | $0.00 | $10,000.00 | 087 | 00030 | OBC PURCHASE | 26274 | 402170671; 402170672 |

| Total | | $0.00 | $72,069.81 |
|-------|--|-------|------------|

| Item 26 | $72,069.81 | |
|---------|------------|-----------|
| Item 27 | 7/30/2019 | 9/3/2019 |

102.    As illustrated by the chart above, the SUBJECT BUSINESS also attempted to avoid currency transaction reporting requirements by keeping individual cash withdrawals under $10,000 and separating them out into multi-day withdrawals.

103.    In total, there were suspicious cash deposits totaling $76,400.00 which funded $66,679.71 in suspicious check payments and suspicious cash withdrawals related to account number 8877427298 from the date of 07/06/2018 through 11/29/2019). These transactions relate to TCF customer Fiesta Envios LLC, Laura Iveth Solano, and Victor Humberto Rosas Trujillo and give the appearance of structuring to avoid the filing of a CTR and check fraud.

### CHS-1 Contact with CORTES-DURAN at SUBJECT BUSINESS

104.    On January 31, 2020, at approximately 12:20 PM, myself and SA Gibson directed CHS-1 to go to the SUBJECT BUSINESS of CORTES-DURAN in order to ascertain her new phone number and set up a controlled purchase.   CORTES-DURAN currently works at the SUBJECT BUSINESS.   While CHS-1 was at the SUBEJCT BUSINESS, CHS-1 stated CORTES-DURAN was behind the counter as an employee or owner would be.

105.    CORTES-DURAN provided the CHS-1 with her new cellular phone number, 970-652-7633, as her "customer" number in order to conduct drug related business with CHS-1.

106.    During the meeting, CORTES-DURAN informed CHS-1 that she (CORTES-DURAN) could "send for the 3 pounds of methamphetamine to be delivered to CHS-1" that CHS-1 had previously indicated he/she wished to purchase.   CHS-1 indicated that he/she needed to contact his/her client in order to conduct the purchase.

### *Controlled Purchase #5: Three Pounds of Methamphetamine Involving TARGET VEHICLE ONE and TWO*

107.    On February 3, 2020, CHS-1 called CORTES-DURAN to set up a purchase of three pounds of methamphetamine from CORTES-DURAN.   SA Gibson and I were present and recorded the call CHS-1 made to CORTES-DURAN.   CHS-1 informed SA Gibson that CORTES-DURAN told CHS-1 that she, CORTES-DURAN, would be ready with the methamphetamine to sell to CHS-1 later that day.

108.    CHS-1 met with SA Gibson and me at a staging area.   CHS-1 and CHS-1's vehicle was searched for contraband and money with negative results.   CHS-1 was provided with $6,600 in official agency funds and a recording device.   The recording device was switched on.   Later that day at approximately 3:51 PM, CHS-1 arrived at a location dictated by CORTES-DURAN.   At approximately 3:53 PM, agents observed TARGET VEHICLE TWO arrive at the location CHS-1 was at.   I then observed SALAZ park TARGET VEHICLE TWO next to CHS-1's vehicle.   SALAZ then walked over to the vehicle CHS-1 was in and went to the front passenger side door.   SALAZ sat inside the vehicle CHS-1 was in but did not close the door while SALAZ conducted the purchase of the methamphetamine.   At approximately 3:57 PM, agents then observed SALAZ enter TARGET VEHICLE TWO and exited the area.



(Photos are of SALAZ arriving in the Kia and carrying the T-Mobile bag)

109.   Surveillance units then followed SALAZ to the SUBJECT BUSINESS.   At approximately 4:09 PM, surveillance units observed SALAZ park TARGET VEHICLE TWO in front of the business, exit TARGET VEHICLE TWO and enter the business. Approximately thirty seconds later, surveillance observed SALAZ exit the business, enter TARGET VEHICLE TWO and exit the area.   At this same time, surveillance units also observed TARGET VEHICLE ONE parked at the business.   Later that night, electronic surveillance observed CORTES-DURAN exit the business and enter TARGET VEHICLE ONE and exit the area.



(Photos are of SALAZ entering and exiting Envios La Paz on February 3, 2020, at 4:09PM)

110.   CHS-1 met with SA Gibson and me.   The recording device was deactivated.   CHS-1 stated that SALAZ went to the front passenger side door of the vehicle he/she was in and handed CHS-1 a T-Mobile paper bag she carried to CHS-1's vehicle.   The methamphetamine was in clear plastic bags inside the T-Mobile paper bag.   SALAZ then took the cash and left.     CHS-1 provided SA Gibson me with a T-Mobile paper bag that contained the suspected methamphetamine.   CHS-1 and CHS-

1's vehicle was searched for contraband and money with negative results.   CHS-1 advised that SALAZ provided CHS-1 with the T-Mobile paper bag containing the suspected methamphetamine and CHS-1 provided SALAZ with the $6,600 in official agency funds.   The suspected methamphetamine was field-tested and tested positive for the presence of methamphetamine.   The packaged weight of the methamphetamine was 1429.5 grams.

 

## **CONCLUSION**

109.     Based on the above facts, I believe there is probable cause to believe that PUEBLITO CORTES-DURAN and MALISSA ANN SALAZ and others are engaged in violations of the Target Offenses, and fruits and items used in furtherance of those offenses, as specified in Attachment B of this affidavit, are located at the locations described in Attachments A of this affidavit.

110.     I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment B to each

requested warrant.

I, Marc A. Soto, Homeland Security Investigations, having signed this affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

Dated this ___ day of February, 2020, at Denver, Colorado.


*s/Marc A. Soto*
SA Marc A. Soto
Homeland Security Investigations


SUBSCRIBED and SWORN to before me this __11th__ day of February, 2020, at Denver, Colorado.


HON. MICHAEL HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO